Gerald H. GOLDBERG, Director of Revenue, State of Missouri, Petitioner-Respondent,

v.

STATE TAX COMMISSION, Respondent-Appellant.

No. 62821.

Supreme Court of Missouri.

Aug. 23, 1982.

Rehearing Denied Oct. 12, 1982.

Jack S. Curtis, Springfield, for respondent-appellant.

John Ashcroft, Atty. Gen., Richard L. Wieler, Asst. Atty. Gen., Jefferson City, for petitioner-respondent.

William D. Crampton, Thomas C. Walsh, Juan D. Keller, St. Louis, for Associated Industries of Missouri.

Lawrence H. Weltman, John P. Barrie, Lea A. Bailis, St. Louis, for Checker Food Products Co. and Swing-A-Way Mfg.

Ernest M. Fleischer, J. Scott Merritt, Jr., Steven J. Beilke, Kansas City, for Continental Disc Corp., et al.

WELLIVER, Judge.

The State Tax Commission appeals a circuit court judgment reversing its decision in favor of Paul Mueller Company, the real party in interest, and reinstating an assessment by the director of revenue of additional income tax against Mueller for the years 1972 through 1975. The issue is whether Mueller may, for purposes of determining its Missouri income tax liability, apportion the income it derived from the sale of goods to out-of-state customers. The director of revenue determined, and the trial court held, that it may not. We reverse and remand.

I

Paul Mueller Company is a Missouri corporation located in Springfield, Missouri, that manufactures stainless steel products for sale throughout the United States and in a number of foreign countries. Many of its products are specially manufactured to meet customer specifications. Mueller is not domesticated in any other state, and it neither owns property nor maintains branch offices outside Missouri. It employs sales representatives who live outside the state, and the salesmen based at the Springfield office also travel extensively throughout the United States. All of the sales representatives are under the control of the Springfield office, which must approve all purchase orders and receive all payments. Negotiations with potential purchasers are often necessary after solicitation of orders when terms appearing in purchase orders are not in accord with terms proposed by Mueller. All of Mueller's products are manufactured in Springfield, and most are shipped F.O.B. Springfield. Personnel are sent from the Springfield office whenever Mueller's products require service or repair.

Although Mueller paid no income tax to any other state during the years in question, for 1972 it apportioned its income pursuant to the single factor formula set forth in § 143.040(2), RSMo 1969, and for 1973 through 1975 it did the same under the formula prescribed in § 143.451(2)(2)(b), RSMo 1978.[1] Mueller included half its in-

1. Section 143.451(2)(2)(b), RSMo 1978, provides:

The amount of sales which are transactions wholly in this state shall be added to one-half of the amount of sales which are transactions partly within this state and partly without this state, and the amount thus obtained shall be divided by the total sales or in cases where sales do not express the volume of business, the amount of business transacted

wholly in this state shall be added to one-half of the amount of business transacted partly in this state and partly outside this state and the amount thus obtained shall be divided by the total amount of business transacted, and the net income shall be multiplied by the fraction thus obtained, to determine the proportion of income to be used to arrive at the amount of Missouri taxable income. The investment or reinvestment of its own funds, or

come derived from sales to purchasers outside Missouri in the numerator of the single factor formula on the ground that those sales resulted from transactions that occurred partially within and partially without the state. The director of revenue, however, disallowed that calculation, ruling that the transactions occurred solely within Missouri and that all of the income derived therefrom should have been included in the computation. The State Tax Commission reversed the director's decision, holding that a portion of the transactions occurred outside the state. The director appealed to the circuit court, which reversed the Commission's ruling as unsupported by substantial evidence upon the whole record and reinstated the director's determination. This appeal followed.

## II

This case presents an issue of far-reaching significance to Missouri businesses engaged in interstate commerce.[2] The central inquiry is the method by which the determination is to be made whether a taxpayer may for Missouri income tax purposes allocate income earned from the transaction of business in interstate commerce. In *M.V. Marine Co. v. State Tax Commission*, 606 S.W.2d 644, 649 (Mo. banc 1980), we said that the advent of the Multistate Tax Compact, § 32.200, "has simplified the process of determining entitlement to apportion taxes by changing the focus of the inquiry from a search for the 'source' of income to a simple showing of jurisdictional 'tax liability' in another state." We are asked on rehearing in this case and those argued with it[3] to reexamine that statement, which the prior opinion herein followed.

Missouri enacted the Compact in 1967. S.B. 3, 74th Gen.Assem., Reg.Sess., 1967 Mo. Laws 102. Article III, § 1 of the Compact provides in part that a taxpayer may elect to apportion his income pursuant to either Article IV of the Compact or state law existing independently of the Compact if that income "is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states." Article IV, § 2 of the Compact provides in part that "[a]ny taxpayer having income from business activity which is taxable both within and without this state" shall apportion his net income as therein provided. Relying upon *M.V. Marine,* the director of revenue argues that the trial court's decision should be affirmed because Paul Mueller Company paid no income tax in any other state during the years in question and has made no showing that it was subject to tax liability in any other state. The sole issue before this Court, therefore, is whether *M.V. Marine's* statement of the law is correct. Upon this reexamination we conclude that it is not.

*M.V. Marine* involved income from the lease of barges. Those transactions were fully consummated within Missouri, and the income therefrom was properly taxable by Missouri under the applicable statutes, now § 143.451. The result in *M.V. Marine* was eminently correct. The question whether the lessee's income from the use of the barges in interstate commerce was taxable in Missouri was never an issue in the case and had no bearing on whether or not consideration given for the leases was taxable

sale of any such investment or reinvestment, shall not be considered as sales or other business transacted for the determination of said fraction.

That section was enacted as a part of the income tax revision of 1972. S.B. 549, 76th Gen. Assem., 2d Reg.Sess., 1972 Mo.Laws 698, 713–14. The single factor formula of § 143.-451(2)(2)(b), RSMo 1978, is identical in relevant respects to its predecessor statute, § 143.-040(2), RSMo 1969.

Henceforth all statutory references are to RSMo 1978 unless otherwise indicated.

2. The following filed briefs as amici curiae in addition to the briefs filed by the parties: Associated Industries of Missouri; Checker Food Products Co. and Swing-A-Way Manufacturing Co.; Continental Disc Corp., Mid-Western Machinery Co., Russell Stover Candies, Inc., and Rival Manufacturing Co.; and the Multistate Tax Commission. The Missouri Chamber of Commerce also appeared as amicus curiae.

3. *Langley v. Robert Baskowitz Enterprises,* No. 62541; *Montgomery Ward & Co. v. State Tax Comm'n,* No. 62476.

as income earned solely in Missouri. The discussion of the Compact was unnecessary to the decision. In our preoccupation with a result so obviously correct, we unanimously failed to foresee the possible ramifications of the dictum in its application to subsequent cases.

## III

■ The flaw in the *M.V. Marine* dictum rests upon a fundamental misinterpretation of the purpose underlying the adoption of the Compact. The Compact was never intended by anyone to be a substantive taxation statute. Instead, it was the product of a fear among the states that Congress would act to wrest from the states the authority to tax the income of businesses operating in interstate commerce. It was conceived as merely a procedural vehicle by which the states could resolve conflicts among themselves and aggrieved taxpayers concerning the proper scope of taxation authority that affected states could exercise with regard to a taxpayer subject to taxation in more than one state.

The United States Supreme Court held in *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), that states could tax the net income from the interstate operations of foreign corporations if the tax were non-discriminatory and were fairly apportioned to local activities that constituted a sufficient nexus to support the exercise of the taxing power. Following *Portland Cement,* Congress acted to establish minimum standards for the exercise of that power by providing, among other things, that a state may not tax a foreign corporation on income derived from the transaction of business in interstate commerce if the corporation's only contact with that state is the solicitation of orders for the sale of tangible personal property. Act of Sept. 14, 1959, § 101(a), Pub.L. No. 86–272, 73 Stat. 555, 555 (codified at 15 U.S.C. § 381(a) (1976)). The Compact was drafted in 1966 as a response to this and other judicial and legislative activity. *See generally United States Steel Corp. v. Multistate Tax Commission,*

434 U.S. 452, 454–57, 98 S.Ct. 799, 803–04, 54 L.Ed.2d 682 (1978). As the drafters of the Compact themselves explained,

the basic justification for the Multistate Tax Compact is that the States themselves are the most appropriate instruments for the determination of their own tax laws and policies. The Compact is a means by which the States can cooperatively work out any problems which may exist, or which may arise in the future, because businesses function in more than one State. Further, *the record of activity in Congress over the past few years appears to make it likely that if the States do not take cooperative action to deal with the problems alleged to exist, Federal legislation restricting the jurisdiction of the States and their local governments to tax will ensue.* This may be true whether or not allegations that serious problems and inequities exist are actually covered.

In 1959, the United States Supreme Court decided the Northwest Portland Cement and Stockham Valve cases. The net effect of these decisions, and of that in the Scripto case of 1961, was to make it absolutely clear that State and local jurisdiction to tax could rest on sales activity of the taxpayer within the jurisdiction, even if the taxpayer had no physical property or fulltime employees within the jurisdiction.... [T]he final judicial determination that such was the case led some elements of the multistate business community to press for Federal legislation that would establish a contrary result. Within months of the Northwest and Stockham decisions, this pressure succeeded in securing enactment of Public Law 86–272, a statute which removed many sales activities of out-of-state firms from State and local taxing jurisdiction....

Also authorized by Public Law 86–272 and amendments to it was a study of State and local taxation of multistate businesses. On the last day of the first session of the 89th Congress, the Willis Subcommittee presented its bill, H.R. 11798. *Briefly stated, H.R. 11798 would*

*have limited drastically the jurisdiction of State and local governments in the fields of income, sales and use, gross receipts and capital stock taxation. It would have injected the Federal Government into the administration of State and local tax laws and adjudication of tax* disputes. Finally, it would have prohibited certain practices complained of.

The several more recent Congressional bills, like H.R. 11798, prevent overlapping or nonuniform State and local taxation by the simple expedient of exempting certain multistate businesses from such taxation. Obviously, this would relieve the favored taxpayers of any compliance burdens or from any concern with nonuniformity of State and local laws. But *it would do so at the expense of State and local revenue raising capacity,* and without attempting to determine whether the favored taxpayers actually do owe any obligation of support to the jurisdictions affected.

Multistate Tax Commission, Suggested State Legislation and Enabling Act, at C–3 to C–4 (emphasis added), *reprinted in* 23 Committee of State Officials on Suggested State Legislation, Council of State Governments, Suggested State Legislation, at C–3 to C–4 (1968).

In short, the Compact represents an effort by the states to devise some method by which they could settle disputes among themselves and aggrieved taxpayers regarding the taxation of the income of businesses operating in interstate commerce. It provides the vehicle that allows the states to avoid a confrontation with the federal government by settling their own disputes and, at the same time, permits them to continue to take a bite of the income earned by businesses in interstate commerce. The purpose clauses of Article I and the arbitration provisions of Article IX confirm this interpretation. Only through a cooperative effort such as the Compact could the states forestall the threat that Congress might take from them the authority to tax any

part of income earned from business conducted in interstate commerce. The drafters of the Compact and those states that adopted it never intended for it to have a substantive effect on taxation. That was not its purpose.

## IV

Any reasonable reading of the evidence before us compels the conclusion that neither the Multistate Tax Commission, which was established pursuant to Article VI of the Compact, nor the Missouri legislature ever intended that the Compact have the effect that *M.V. Marine* would give it.

The issue in this case is not whether a taxpayer may elect to apportion its income under either the Compact or § 143.451, but whether apportionment will be allowed at all. The Multistate Tax Commission, in its memorandum filed as amicus curiae, argues that *M.V. Marine's* dictum is a correct statement of the law and that a "proper interpretation of the Missouri Income Tax Statutes," including the Compact, would be that a "taxpayer is entitled to apportion and allocate its income only when it is subject to an income tax or other tax on its business activities by another state or country." Oddly enough, however, the Commission's own regulations contradict that position. Multistate Tax Commission Regulation III.1.(A) provides:

Reg. III.1.(A). Taxpayer option, state and local taxes; state apportionment and allocation.—This option is available to taxpayers whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of the party state. The provisions of this compact are a part of the law of a compact state. *To qualify for election, therefore, the taxpayer's income must be subject to apportionment and allocation either (1) under the income tax laws of the party state, other than by reason of Article IV, or (2) under Article IV.*

All St. Tax Guide (P–H) ¶ 612 (1977).[4] From this regulation it is clear that the

4. Part of the confusion leading to our error in *M.V. Marine* may have arisen out of the fact

that the Missouri Department of Revenue

adoption of the Compact was not intended to foreclose the use of the "income tax laws of a party state" that exist independently of the Compact for making the determination whether a taxpayer is entitled to apportion. Under longstanding construction of Missouri law, that determination is made with reference to the "source of income" test of § 143.451 and its predecessors. *See International Travel Advisors, Inc. v. State Tax Commission,* 567 S.W.2d 650 (Mo. banc 1978); *State ex rel. River Corp. v. State Tax Commission,* 492 S.W.2d 821 (Mo.1973), *overruled on other grounds, International Travel Advisors, Inc.; A.P. Green Fire Brick Co. v. Missouri State Tax Commission,* 277 S.W.2d 544 (Mo.1955); *In re Union Electric Co.,* 349 Mo. 73, 161 S.W.2d 968 (banc 1942); *Union Electric Co. v. Coale,* 347 Mo. 175, 146 S.W.2d 631 (1940); *In re Kansas City Star Co.,* 346 Mo. 658, 142 S.W.2d 1029 (banc 1940); *F. Burkhart Mfg. Co. v. Coale,* 345 Mo. 1131, 139 S.W.2d 502 (1940); *Artophone Corp. v. Coale,* 345 Mo. 344, 133 S.W.2d 343 (1939).

The Compact on its face recognizes the existence and applicability of state laws independent of the Compact. Article III, § 1 provides that

> [a]ny taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes *pursuant to the laws of a party state or pursuant to the laws of subdivisions in in or more party states* may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV.

(Emphasis added.) At the time Missouri adopted the Compact in 1967, the "source of income" test embodied in present § 143.451 was effective and therefore was recognized as controlling under Article III, § 1 of the Compact. The dictum of *M.V. Marine* purported to hold that Article IV of the Compact, which in § 2 adopts the jurisdictional standard, effectively abrogated the § 143.-

451 "source of income" test. Such a construction is impermissible. The question in this case is how the taxpayer is to make the threshold determination whether his income is "subject to apportionment and allocation for tax purposes." Article III, § 1 of the Compact requires the taxpayer to look "to the laws of a party state or . . . to the laws of subdivisions in two or more party states." The drafters of the Compact, or the members of the Missouri legislature in adopting it, easily could have provided that the taxpayer must look to the jurisdictional test of Article IV, § 2, but they chose instead to allow the determination whether income can be apportioned to be made with reference to existing state laws other than the Compact itself.

The Multistate Tax Commission as amicus curiae points out that Article IV of the Compact comprises the Uniform Division of Income for Tax Purposes Act, 7A U.L.A. 91–108 (1978), which was first approved by the National Conference of Commissioners on Uniform State Laws in 1957. Section 21 of the uniform act provides for the repeal of "acts and parts of acts." The Missouri legislature did not adopt that section of the act, and thus repealed no laws, when it adopted Article IV as a part of the Compact. It is clear, therefore, that the legislature did not intend by the adoption of the Compact to vitiate the "source of income" test of § 143.451.

Evidence exists that is even more affirmative. First, the legislature has specifically refused to enact three bills that would abolish the "source of income" test in favor of the Compact's jurisdictional test. H.B. 507, 80th Gen.Assem., 1st Reg.Sess. (1979); S.B. 566, 79th Gen.Assem., 2d Reg. Sess. (1978); H.B. 1682, 79th Gen.Assem., 2d Reg.Sess. (1978). Two other bills that would have altered or abolished the single factor formula of § 143.451 in favor of the three factor formula embodied in the Compact also failed of adoption. H.B. 1522, 80th Gen.Assem., 2d Reg.Sess. (1980); S.B. 471, 79th Gen.Assem., 1st Reg.Sess. (1978). In those the legislature made no attempt at

adopted only suggested Regulation IV and not suggested Regulation III.

all to abolish the "source of income" test. Second, after adoption of the Compact in 1967, the legislature, fully aware of our cases interpreting § 143.451 and its predecessors, reenacted the section in the general revisions of 1969 and 1978 and specifically reenacted it in the income tax revision of 1972,[5] *see* S.B. 549, 76th Gen.Assem., 2d Reg.Sess., 1972 Mo.Laws 698, 713–15. Finally, the legislature has twice taken pains in § 144.010(1)(7), RSMo Supp.1981, to define specifically for purposes of Chapter 143 what is meant by " 'wholly within this state' and not 'in commerce' " and " 'partly within this state and partly without this state' and 'in commerce.' " The definition states:

> (7) . . . For the purposes of taxation under chapter 143, RSMo, a transaction involving the sale of tangible property is:
>
> (a) "Wholly in this state" and not "in commerce" if both the seller's shipping point and the purchaser's destination point are in this state;
>
> (b) "Partly within this state and partly without this state" and "in commerce" if: (i) the seller's shipping point is in this state and the purchaser's destination point is outside this state, or (ii) the seller's shipping point is outside this state and the purchaser's destination point is in this state. The purchaser's destination point shall be determined without regard to the F.O.B. point or other conditions of the sale.

S.B. 200, 81st Gen.Assem., 1st Reg.Sess., 1981 Mo.Laws 232, 234; C.C.S.H.C.S.S.C.S. S.B. 218, 235, 298, 340 & 398, 80th Gen.Assem., 1st Reg.Sess., 1979 Mo.Laws 331, 333–32.

"This Court's primary responsibility is to ascertain the intent of the general assembly from the language used, and to give effect to that intent." *Goldberg v. Administrative*

*Hearing Commission,* 609 S.W.2d 140, 144 (Mo. banc 1980). It takes no strained interpretation to make that determination. The English language need only be read sequentially: Article IV of the Compact must be read as following Article III. Rarely has this Court been presented with more positive proof of legislative intent. We should heed that directive. The application of the dictum in *M.V. Marine* would produce a result in direct opposition to the clearly expressed intent of the legislature. It is the function of the legislature, and not that of this Court, to impose taxes.

## V

The assumption that the legislature intended to tax all income of corporations doing business in interstate commerce, which both *M.V. Marine* and the opinion before rehearing made, flies squarely in the face of the long-established rule that taxation statutes must be construed strictly against the taxing authority absent a clearly expressed contrary legislative intent. This Court said in *Artophone,* which considered the same statute involved in the present case, that

> [g]enerally it may be said that taxing statutes are to be strictly construed in favor of the taxpayer and the fact that a particular subject of taxation, claimed to be taxed, is within the purview and intendment of the taxing statute must clearly appear from the statute so to be. "It is well established that the right of the taxing authority to levy a particular tax must be clearly authorized by the statute, and that all such laws are to be construed strictly against such taxing authority."

*Artophone Corp. v. Coale,* 345 Mo. at 353, 133 S.W.2d at 347. That principle remains

---

**5.** Section 32.210 does not, as the director of revenue argues, negate this inference of legislative intent. That section provides that "[t]he provisions of the compact shall apply to any tax levied by the state of Missouri or its political subdivisions." The original version of that statute provided only for application of the Compact to income and earnings taxes, *see* § 32.210, RSMo 1969, and was amended to its present form in 1974, *see* H.B. 1291, 77th Gen. Assem., 2d Reg.Sess., 1974 Mo.Laws 712. In view of the purpose of the Compact and the clear legislative intent, it is obvious that § 32.-210 was meant to do nothing more than apply the Compact's dispute resolution mechanism to all forms of disputed taxation, including corporate franchise and stock taxes, and not merely income taxes. It does not abrogate § 143.451.

unquestioned. We hold that the determination whether a taxpayer may elect to apportion income derived from the transaction of business in interstate commerce should be based upon the "source of income" test of § 143.451 and its predecessors and the long-standing judicial interpretation thereof. Language in *M.V. Marine* to the contrary should not be followed.

██ The circuit court found after reviewing the record that Mueller's only activities outside Missouri were the "mere solicitation of orders" to be approved by the home office, and it concluded that in situation the entire transaction occurs within Missouri. The record shows, however, that negotiation over the terms of a contract often occurs after the solicitation of orders but before acceptance of the purchase orders by Mueller. This Court has said that "[t]he word 'transaction' as frequently used in the singular and plural, is practically all inclusive, and signifies any business activity productive of income." *In re Kansas City Star Co.*, 346 Mo. at 672, 142 S.W.2d at 1037. It "is a word of flexible meaning" and "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Artophone Corp. v. Coale*, 345 Mo. at 355, 133 S.W.2d at 348. In this case both the solicitation of orders outside the state [6] and any negotiation necessary before consummation of the contract were integral components of the entire transaction, and they should have been considered. We held in *International Travel Advisors* that the statute imposes a tax on income derived from "transactions," which

encompasses more than "sales." 567 S.W.2d at 654. The trial court ignored those portions of the transactions occurring outside of Missouri [7] and in essence applied a "sales," rather than a "transactions," test.

The judgment of the circuit court is reversed, and the cause is remanded for entry of judgment affirming the decision of the State Tax Commission.

DONNELLY, C.J., and SEILER and BARDGETT, JJ., concur.

HIGGINS, J., dissents in separate dissenting opinion filed.

RENDLEN and MORGAN, JJ., dissent and concur in separate dissenting opinion of HIGGINS, J.

HIGGINS, Judge, dissenting.

I dissent because I believe the majority opinion misconstrues and fails to apply this Court's decision in *M.V. Marine Co. v. State Tax Commission*, 606 S.W.2d 644 (Mo. banc 1980) [1] in resolution of this case.

Paul Mueller Company, in support of this appeal, contends the trial court erred in its reversal of the ruling of the State Tax Commission. It asserts: (1) the Commission's finding that Mueller's sales to out-of-state customers constituted transactions partly in and partly outside Missouri is supported by substantial and competent evidence; (2) the court's finding that Mueller's sales to out-of-state customers constituted transactions wholly within Missouri and taxable one hundred percent in Missouri is contrary to § 143.451, RSMo 1978, the terms of which are to be strictly construed

6. As noted above, federal law prohibits a state from taxing the income of a foreign corporation when the corporation's only contact with that state is the solicitation of orders for the sale of tangible personal property. 15 U.S.C. § 381(a) (1976). That law, however, has no bearing on this case. In view of our rejection of *M.V. Marine's* jurisdictional "tax liability" test, whether Mueller paid tax or was subject to taxation in another state is irrelevant for purposes of determining whether it may apportion its income for Missouri income tax purposes.

7. The dispute in this case arose before the legislature enacted § 144.010(1)(7), RSMo

Supp.1981, quoted above, which defines the situations in which a transaction occurs partially within and partially without the state. Under that statute there would be no question that the transactions involved here are partially within and partially without the state, because "the seller's shipping point is in this state and the purchaser's destination point is outside this state."

1. Unanimous opinion by Morgan, J.; Bardgett, C.J., Donnelly, Rendlen, Seiler and Welliver, JJ., and Welborn, Sp.J., concurring.

against the taxing authority; (3) such finding and decision is contrary to the legislative intent of § 143.451, RSMo 1978, and its predecessors, evidence of which is to be found in legislative language, re-enactment after judicial construction and failure of proposed legislation to the contrary; (4) such finding and decision is contrary to this Court's previous interpretation of § 143.-451, RSMo 1978, with the exception of *M.V. Marine Co. v. State Tax Commission, supra,* which should be distinguished or overruled.

Dispositive of this case is whether the decision in *M.V. Marine* controls the present case. In that case this Court recognized that "the advent of the [Interstate Tax] Compact has simplified the process of determining entitlement to apportion taxes by changing the focus of the inquiry from a search for the 'source' of income to a simple showing of 'tax liability in another state.'" *Id.* at 649, quoting from § 32.200 art. IV, 2., RSMo 1978. Application of this rule in the present case means that unless and until Paul Mueller Company shows that a state other than Missouri has jurisdiction to subject it to tax on its business activities outside this state, it cannot elect to apportion income pursuant to § 143.451, or § 32.200, art. IV, RSMo 1978.

Mueller would distinguish *M.V. Marine* as factually unique and inapplicable to the present case; however, the ruling in that case is one of statutory interpretation and not a factual determination. The legal issue of a taxpayer's eligibility to apportion income pursuant to § 143.451, RSMo 1978, is involved in the present case the same as in *M.V. Marine.*[2]

Mueller, in recognition that its tendered distinction might prove unacceptable, urges alternatively that this Court should recon-

sider and overrule *M.V. Marine,* asserting it to be contrary to prior decisions of this Court as well as the plain meaning and legislative intent of sections 32.200, art. III.1, 143.431, and 143.451, RSMo 1978.[3] The arguments are for a return to the rule first recognized in *Artophone Corporation v. Coale,* 345 Mo. 344, 133 S.W.2d 343 (1939), and most recently in *International Travel Advisors, Inc., v. State Tax Commission,* 567 S.W.2d 650 (Mo. banc 1978). Pursuant to these cases, and others, it is asserted that Mueller is permitted to use the single factor apportionment formula of § 143.451.2(2)(b), RSMo 1978, and include in the numerator thereof one-half of its income from out-of-state customers because a) this income is not exclusively "derived from sources within this state" § 143.451.1, RSMo 1978, and b) this income is from "... sales which are transactions partially within this state and partly without this state ..." Sec. 143.-451.2(2)(b), RSMo 1978. Mueller further asserts that a corporate taxpayer may elect to use this method of apportionment found in Chapter 143, RSMo 1978, or alternatively elect to use the three factor apportionment formula of the Compact. Sec. 32.200, art. IV, 3, RSMo 1978. It is argued that Chapter 143, RSMo 1978, and the Compact operate independently and that the corporate taxpayer's choice determines which shall apply; that if § 143.451.2(2)(b), RSMo 1978, apportionment is sought, only § 143.451.1 must be satisfied. In support of this view, Mueller relies on the following language from Article III of the Compact:

1. Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in

---

**2.** Although conceding "[t]he result in *M.V. Marine* was eminently correct," the majority dismisses application to this case by an assertion that "[t]he discussion of the Compact was unnecessary to the decision"; and that in "preoccupation with a result so obviously correct we failed to foresee the possible ramifications of the dictum's use."

**3.** Paul Mueller Company is joined in arguments aimed at distinguishing or overruling *M.V. Ma-*

*rine* by *Amicus Curiae* Associated Industries of Missouri, Continental Disc Corporation, Mid-Western Machinery Co., Inc., Russell Stovers Candies, Inc., Rival Manufacturing Co., Checker Food Products Co., and Swing-A-Way Manufacturing Co. The Director's position is supported by the Multistate Tax Commission filing as *amicus curiae.* Article VI of the Compact creates the Commission, the purpose of which is set out in art. VI, § 3.

two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV. This election for any tax year may be made in any party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others . . . .

Sec. 32.200, art. III.1., RSMo 1978. *M.V. Marine* is said to be contrary to this provision because this Court held a taxpayer must show it is entitled to apportion income by proving it is subject to tax in another state thereby providing a limitation on the taxpayer's choice by requiring that a provision of the Compact be satisfied before § 143.451, RSMo 1978, apportionment may be used. It is argued that the "subject to tax" requirement of the Compact, § 32.200, art. IV, 2., 3.(1), RSMo 1978, only applies to one who elects to use the Compact's three factor apportionment formula, and that the issue with regard to § 143.451, RSMo 1978, apportionment is the "source of income," citing sections 143.431 and 143.451.1, RSMo 1978.

I

Whether the interpretation of the Compact and § 143.451, RSMo 1978, made in *M.V. Marine* should be overruled depends upon how these laws are to be construed, considering the applicable rules of construction. As stated in the *Artophone* case, 133 S.W.2d at 347:

We need not here discuss or consider the question whether or not the Legislature *could* tax the entire net income *from all sources* of a domestic corporation. The question is does the present law do so? Generally it may be said that taxing statutes are to be strictly construed in favor of the taxpayer and the fact that a particular subject of taxation, claimed to be taxed, is within the purview and intendment of the taxing statute must clearly appear from the statute so to be.

"It is well established that the right of the taxing authority to levy a particular tax must be clearly authorized by statute, and that all such laws are to be construed strictly against such taxing authority." *State ex rel. Ford Motor Co. v. Gehner,* 325 Mo. 24, 29, 27 S.W.2d 1, 3, and cases cited. Of course "The primary rule of construction of statutes is to ascertain the lawmakers' intent, from the words used if possible; and to put upon the language of the Legislature, honestly and faithfully, its plain and rational meaning and to promote its object and 'the manifest purpose of the statute, considered historically,' is properly given consideration." *Cummins v. Kansas City Public Service Co.,* 334 Mo. 672, 684, 66 S.W.2d 920, 925.

These rules are equally applicable in the present case. Additional rules are applicable in this case because the Compact is considered as it relates to Chapter 143, RSMo 1978. When more than one statutory provision is involved, the Court must consider that the law does not favor a repeal by implication, but instead the provision relating to the same subject matter must if possible be construed so as to maintain the integrity of each. 2A C. Sands, Sutherland Statutory Construction, §§ 51.01, 51.02, at 287–291 (4th ed. 1973); *See, e.g., City of Raytown v. Danforth,* 560 S.W.2d 846, 848 (Mo. banc 1977). Statutes must be read in *para materia,* giving effect to each word, clause and provision, *State ex rel. Fort Zumwalt School Dist. v. Dickherber,* 576 S.W.2d 532, 536 (Mo. banc 1979); *Blue Springs Bowl v. Spradling,* 551 S.W.2d 596 (Mo.1977); a chronologically later statute, which functions in a particular way will prevail over an earlier statute of a more general nature, *Laughlin v. Forgrave,* 432 S.W.2d 308 (Mo. banc 1968); and the latter statute will be regarded as an exception to or qualification of the earlier general statute, *City of Flat River v. Mackley,* 212 S.W.2d 462 (Mo.App.1948). *See generally* Sutherland Statutory Construction, *supra,* § 51.02.

## II

Article III.1 of section 32.200, RSMo 1978, upon which Mueller and *Amici* rely begins with the proviso: "Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state...." This phrase qualifies the taxpayer's right to "elect to apportion and allocate his income in the manner provided by the laws of such state...." *Id.* The question is when is one's income subject to apportionment and allocation for tax purposes? Mueller argues that Chapter 143 is the party state law which is meant to satisfy the proviso of Article III.1. It is argued that the provisions of § 143.451 determine eligibility to apportion or allocate pursuant thereto. To the contrary, the Director asserts and *M.V. Marine* held that § 32.210, RSMo 1978, mandates reference to the Compact art. IV.2 to determine entitlement to allocate or apportion. Section 32.210 states:

> *Compact to apply to all state and local taxes.*—The provisions of the compact shall apply to any tax levied by the state of Missouri or its political subdivisions.

This section is not part of the Multistate Tax Compact as adopted by other party states; it is unique to Missouri. Therefore, although it is among the statutory sections which comprise the Compact as adopted in Missouri, it is the "law of a party state" because it is specifically Missouri law and not part of the uniform provisions as adopted by all compact states. Section 32.210, RSMo 1978, clearly expresses the requirement that the Compact apply "to any tax levied by the state." This must include whether "a taxpayer is subject to apportionment and allocation." The decision in *M.V. Marine* made this interpretation originally, wherein it held:

> With this legislative declaration in mind, we conclude that although taxpayers still are given an option on the *method* of allocation they may use, all other

questions reference apportionment of income are to be resolved by reference to the Compact. We reach this conclusion by virtue of the mandatory language of § 32.210, the provisions of § 32.200, art. III. § 1 providing for the choice of methods of allocation and the continued existence of § 143.451 which sets out some of those choices.

*Id.* 606 S.W.2d at 649.

*Amicus* on behalf of Mueller and the majority opinion assert that § 32.210, RSMo 1978, is not entitled to an interpretation of this importance because it is "merely a procedural vehicle" and such a reading is negated by the subsequent enactment of the "new" income tax provision, § 143.451, in 1972; five years after the enactment of the Compact and § 32.210 in 1967. *See* Laws of Mo.1967, p. 102, 113; Laws of Mo.1972, p. 698. It is admitted that § 32.210, RSMo 1978, was amended to its current form in 1974, but it is argued that this modification did not change the relationship of the Compact and Chapter 143, RSMo 1978, as fixed in 1972. This is not so. Section 32.210, RSMo 1978, as amended in 1974 is more inclusive than the original 1967 version. It declares "any tax levied" to be within the purview of the Compact. The original included only "state income tax." Laws of Mo.1974, p. 712; *compare* Laws of Mo.1967, p. 113. The current § 32.210, RSMo 1978, is the most recent legislative enactment in the area and continues to include income tax. It has the same effect upon the use of the Compact and Chapter 143, RSMo 1978, as the original version. The procedural versus substantive distinction is not pursuasive because the effect of the statute is the same. The taxpayer when deciding how to proceed in determining taxable income must apply the terms of the Compact first and then "proceed" to elect which formula to use once entitlement to do so is shown.[4]

## III

Next it is argued that if *M.V. Marine* is correct and the right to apportion is deter-

4. It is noted that the Multistate Tax Commission, appearing as an *amicus curiae* supports the interpretation of the Compact and § 32.210 originally decided in *M.V. Marine* and herein accepted.

mined by reference to article IV.2 then the provision of 143.451, RSMo 1978, will be rendered meaningless because the former provides that where the income "is taxable both within and without this state ... [taxpayer] shall allocate and apportion his net income as provided in this article." *Id.* Thus it is argued that "shall" requires taxpayers to use the three factor formula of the Compact; excluding the election of § 143.451, RSMo 1978, which *M.V. Marine* purports to permit. This same argument can be made in reverse. That is, if the interpretation tendered by Mueller be accepted then numerous situations would exist where the Compact would not in any way be applied, contrary to the requirement that it "shall apply to any tax levied by the State of Missouri." Read in *para materia* the provisions may appear in some conflict; however, the clear expression in article III that one may elect to apportion or allocate pursuant to the laws of a party state, overrides the ordinarily mandatory effect of the single word "shall" as it appears in article IV.2.[5]

The foregoing interpretation is supported by the manifest intent and purpose of the Compact as expressed in article I. This is particularly true when it is recognized that the purpose of the Compact and that of Chapter 143, RSMo 1978, may be harmonized only when read as in *M.V. Marine.* In demonstrating this point, this Court turns to Mueller's argument that the *M.V. Marine* decision contradicts legislative intent as consistently recognized by this Court in previous cases: *International Travel Advisors, Inc., v. State Tax Commission,* 567 S.W.2d 650 (Mo. banc 1978); *State ex rel. River Corp. v. State Tax Commission,* 492 S.W.2d 821 (Mo.1973), overruled in *International Travel Advisors, Inc. v. State Tax Commission, supra; A.P. Green Fire Brick Co. v. State Tax Commission,* 365 Mo. 1163, 277 S.W.2d 544 (1955); *In re Union Electric Co.*

*of Missouri,* 349 Mo. 73, 161 S.W.2d 968 (banc 1942); *Union Electric Co. v. Coale,* 347 Mo. 175, 146 S.W.2d 631 (1940); *In re Kansas City Star, Co.,* 346 Mo. 658, 142 S.W.2d 1029 (1940); *F. Burkhart Mfg. Co. v. Coale,* 345 Mo. 1131, 139 S.W.2d 502 (1940); and *Artophone Corp. v. Coale,* 345 Mo. 344, 133 S.W.2d 343 (1939). Mueller argues that legislative approval of the intent which this Court has imputed to the statute's "source of income" language is indicated by the history of § 143.451, RSMo 1978. The basic provisions of that section were re-enacted by the general revisions of 1969 and 1978, and specifically re-enacted in the income tax revision of 1972, Laws of Mo.1972, p. 698, all of this since the Compact was originally adopted in 1967. Laws of Mo.1967, p. 102. Mueller notes that a number of attempted revisions to § 143.451, RSMo 1978, have not passed, and it is suggested from this that no change in the section is desired by the legislature, thus constituting full approval of its pre *M.V. Marine* construction by this Court.

No case other than *M.V. Marine* has addressed what effect adoption of the Compact has had on a taxpayer's entitlement to elect to allocate or apportion. Although in other cases the single factor formula has been referred to as "the elective alternative formula," this is in regard to a taxpayer's right to use the apportionment formula as opposed to the allocation method. *See, e.g., International Travel Advisors, Inc. v. State Tax Commission,* 567 S.W.2d at 653. The right to elect one versus the other is distinct from the entitlement to use either. The right to the former is not affected by *M.V. Marine.* Notwithstanding their limited precedential value, examination of cases decided prior to *M.V. Marine* is useful to illustrate that the Compact may in part have been adopted to remedy the problems presented by these cases.

**5.** This was recognized in Kentucky. *Clinton Shirt Corp. v. Kentucky Bd. of Tax Appeals,* 583 S.W.2d 84, 87 (Ky.App.1978). The legislature of that state had adopted the Uniform Division of Income for Tax Purposes Act, which constitutes *only* art. IV of the Compact, while keeping intact another corporate income

tax law. *Compare* Ky.Rev.Stat. § 141.-010(14)(a) (1970) *with* Ky.Rev.Stat. § 141.-120(2)–(3) (1970). The legislature of Kentucky resolved the conflict by deleting § 141.120(2)–(3) and incorporating the new definition of taxable net income into § 142.120. *See* Ky.Rev. Stat. § 141.120(2) (Cum.Supp.1980).

In *Artophone Corporation v. Coale, supra,* this Court determined that § 10115, RSMo 1929, (the statutory predecessor to sections 143.040, RSMo 1969, and 143.451, RSMo 1978) was enacted to impose a tax upon the net income of every corporation "from all sources in this state," quoting from the statute, including that which represents the Missouri portion of transactions done partly in and partly out of this state. *Id.* 133 S.W.2d at 346. In that case and a number of subsequent cases, this Court has attempted to determine what constitutes the "source of income." The tests used to determine the "source of income" appear to vary among the cases depending on whether allocation § 143.451.2(1), RSMo 1978, or apportionment (single factor formula), § 143.451.2(2)(b), RSMo 1978, is used by the taxpayer.

In the "allocation" or "source of income" cases, the "source of income" has been determined by locating the place where it was earned or produced, if by labor, where the labor is performed—if by capital, the place where the capital is employed. *A.P. Green Fire Brick Co. v. State Tax Commission,* 277 S.W.2d at 548; *In re Union Electric Co. of Missouri,* 161 S.W.2d at 971; *Union Electric Co. v. Coale,* 146 S.W.2d at 635; *see also In re Kansas City Star Co.,* 142 S.W.2d at 1037. The cases involving use of the apportionment formula of § 143.451.2(2)(b), RSMo 1978, have been resolved by a completely different test: Whether the "sale which is a transaction" occurred partly within and without this state, and thereby included in the formula numerator at one-half. *International Travel Advisors, Inc. v. State Tax Commission,* 567 S.W.2d at 653; *State ex rel. River Corp.,* 492 S.W.2d at 824–26; *F. Burkhart Mfg. Co. v. Coale,* 139 S.W.2d at 503; *Artophone Corp. v. Coale,* 133 S.W.2d at 349; *see also In re Kansas City Star Co.,* 142 S.W.2d at 1037. Thus two distinct tests have been developed and used to determine whether specific income is from a Missouri source, non-Missouri source, or partly from each. The statutory language of subdivisions (1) (allocation) and (2)(b) (apportionment) of 143.451.2, RSMo 1978, and the statutory predecessors thereto are ambigu-

ously worded but arguably warrant the use of different computation and analysis to determine taxable income. See Note, The Single Factor Method of Interstate Allocation of Corporate Net Income In Missouri: The Worst Of All Possible Worlds?, 22 St.L. U.L.J. 614 (1978); Note, State Income Taxation-Apportionment-Missouri's Single Factor Formula Is Based On Sales, 18 St.L.U. L.J. 474 (1974). The right to exclude certain income from the amount which is taxable in Missouri is, however, still at issue in all cases.

Notwithstanding this common theme, the statutory language has caused difficulty and the cases conflict in their constructions of it. This confusion is demonstrated by the cases of *Artophone Corp. v. Coale, supra; F. Burkhart Mfg. Co. v. Coale, supra; In re Kansas City Star Co., supra; River Corp. v. State Tax Commission, supra;* and *International Travel Advisors, Inc. v. State Tax Commission, supra.* In four of these cases the single factor apportionment formula was in issue and each time the Court was faced with how to construe the phrase "sales which are transactions partially within and partially without" § 143.451, RSMo 1978.

In *Artophone Corp. v. Coale, supra,* the Court broadly construed "transactions" to permit the taxpayer to apportion its income by use of the formula and include one-half of its sales income to out-of-state customers. The "out-of-state portion" of Artophone's "transactions" was the sending of traveling salesmen to other states. In *F. Burkhart Mfg. Co. v. Coale, supra,* (decided less than a year after *Artophone* ) the Court narrowly construed "transactions" to exclude all income which the taxpayer made from sale of products manufactured out of state to out-of-state customers. The Court ruled that the directory control by this Missouri company's executives at the Missouri home office was not sufficient to make any part of the contested sales transaction within this state. This ruling was made contrary to Coale's contention that if traveling salesmen's solicitation was enough to take part of the transaction out of Missouri (as

in *Artophone*) then directory control was sufficient to bring part of the transaction within Missouri.

In *In re Kansas City Star Co., supra,* the Court considered the propriety of the taxpayer's use of a special formula which included as taxable income in Missouri that percentage of its total newspaper circulation which was distributed in this state. *Id.* 142 S.W.2d at 1036; *see* 143.461.2, RSMo 1978. Although the single factor formula was not involved, the Court ruled that "income must be allocated when produced by transactions done partly within and partly without the state." *Id.* 142 S.W.2d at 1038. It recognized that to the extent " 'directory control' by executive officers in Missouri over foreign plants was labor performed" the decision in *F. Burkhart Mfg. Co. v. Coale, supra,* decided just 10 months previously was inconsistent with its present broad definition of "income from transactions done partly within and partly without." *Id.* 142 S.W.2d at 1039. This was because the capital and labor utilized by Burkhart was actually sufficient to include within taxable Missouri income some of that amount which the Court had so recently completely excluded.

In *State ex rel. River Corp. v. State Tax Commission, supra,* the taxpayer had its principal office and plant in Missouri. From this Missouri plant cement was manufactured and shipped to non-Missouri terminals where it was stored and sold. The Court ruled that the place where the sale was completed was determinative of the "source of the income," thus yet another construction of "sales which are transaction" was made. The result in *River Corp.* was that none of the company's income was considered to be even partially from within this state even though the cement sold out of state was manufactured here. One hundred percent of that taxpayer's out-of-state sales income was excluded from Missouri taxable income. This ruling is clearly contrary to *Artophone, supra,* and *Kansas City Star, supra.*

The problematic effect of the *River Corp.* "sales" test was made apparent in *Interna-*

*tional Travel Advisors, Inc. v. State Tax Commission, supra,* wherein taxpayer was a travel agency which solicited tour business from professional and social organizations throughout the country from its Missouri office. The taxpayer's business procedures enabled it to argue based on *River Corp.* that most of its "sales" were made completely out of state, although most of its activities in the transaction of sales were in Missouri. The Court overruled the "location where the sale was completed" test of *River Corp.,* and focused upon the entire transaction to determine income source.

This decisional inconsistency refutes the majority's assertion that any certain construction by this Court has existed for the legislature to approve by re-enactment of the statute. Therefore the deference normally given to statutory interpretation decisions which are subsequently approved by re-enactment is not pursuasive in considering the decision made prior to *M.V. Marine.*

The conflicting results in these cases demonstrate the confusion which surrounds the question when one may apportion. This confusion is caused by the wording of § 143.451, RSMo 1978 (and its precursors). In considering this problem, the Court has repeated the rule that tax statutes are to be strictly construed against the tax authority and in favor of the taxpayer. *State ex rel. River Corp. v. State Tax Commission,* 492 S.W.2d at 824; *In re Kansas City Star Co.,* 142 S.W.2d at 1039. *F. Burkhart Mfg. Co. v. Coale,* 139 S.W.2d at 503; *Artophone Corp. v. Coale,* 133 S.W.2d at 347. The policy behind this rule is that a tax cannot be imposed unless enacted and levied by the legislature and the courts should find a tax only when the intent to levy is clearly expressed. Because the terms "source of income" and "sales which are transactions" are ambiguous this Court has been hard pressed to find therefrom what clearly appears to be "within the purview and intendment of the taxing statute." *Artophone Corp. v. Coale,* 133 S.W.2d at 347. The result has been that income which has its "source" at least in part within Missouri has been excluded from Missouri taxable in-

come. *See e.g. F. Burkhart Mfg. Co. v. Coale, supra; State ex rel. River Corp. v. State Tax Commission, supra.* In this way the cases show an overzealous application of the strict construction rule resulting in an exclusion of income from that portion taxable in Missouri in more instances than would be dictated by any consistent legislative intent which motivates the taxation of income only from sources in Missouri. All of the foregoing led this Court to observe in *M.V. Marine* that the "determination of whether a particular taxpayer was entitled to apportion involved a tortured process of discerning the 'source' of the taxpayer's income." *M.V. Marine,* 606 S.W.2d at 649 [6]. Fortunately this ambiguity has been remedied by the adoption of the Compact. The legislature has expressed its intention to permit allocation or apportionment only when the "subject to tax" test is met. *Id.*

## IV

Next, Mueller argues that adoption of the *M.V. Marine* interpretation of the Multistate Tax Compact returns Missouri to the discriminatory situation which existed prior to 1927 by "taxing domestic corporations on a greater portion of their income and upon a different basis than foreign corporations, who would again be in a favored position." That is if a corporation pays a franchise tax or corporate stock tax in another jurisdiction, it may apportion as it chooses because it is subject to tax as defined in § 32.200, art. IV.3. The result, it is asserted, is the favoring of foreign corporations by decreasing their taxable income in Missouri. This argument assumes that no unfair differentiation occurred between corporate taxpayers, foreign or domestic, between 1927 and the *M.V. Marine* decision. As demonstrated by the above case analysis, different domestic companies (much less foreign companies)

have been held to have different amounts of taxable income despite the use of the "non-discriminatoгy" source rule. *See International Travel Advisors, Inc. v. State Tax Commission, supra; compare River Corp. v. State Tax Commission, supra;* and *F. Burkhart Mfg. Co. v. Coale, supra.* Recognizing these conflicts as this Court must, Mueller's argument is that regardless of whether prior cases properly interpreted the wording of § 143.431 and § 143.451, RSMo 1978, the legislative purpose of those statutes has been properly recognized and is presently controlling. In *Artophone Corp. v. Coale,* 133 S.W.2d at 346–348, without committing itself, the Court suggested:

It is plain, we think, that the original income tax law, that of 1917, did impose a tax upon the entire net income of domestic corporations from all sources, intrastate or interstate. By subsequent legislation, as pointed out above, the Legislature apparently recognized that the original law contained or permitted certain discriminations, which it sought to remove by the amendment or change of 1927, continued in principle, with clarifying provisions on this point, by later amendments. . . . In rewriting or amending the law in 1927 the Legislature evidently had in mind that the then existing law made "certain discriminations between residents and non-residents, and between individuals and corporations." What were those discriminations which the Legislature obviously sought to eliminate? Learned counsel for *Amici Curiae,* in a brief filed with us, thus illustrate:

"As stated before, the 1917 and 1919 Acts discriminated against Missouri corporations. Take, for instance, two large nationwide shoe manufacturing concerns located in St. Louis. Each is competing in the same territory in Missouri and in

---

**6.** And in this context it is not surprising that this Court held *International Travel Advisors, Inc. v. State Tax Commission,* 567 S.W.2d 650 (Mo. banc 1978); *State ex rel. River Corp. v. State Tax Comm'n,* 492 S.W.2d 821 (Mo.1973), overruled in *International Travel Advisors, Inc. v. State Tax Commission, supra; A.P. Green Fire Brick Co. v. Missouri State Tax Commission,* 277 S.W.2d 544 (Mo.1955); *Union Electric*

*Co. v. Missouri,* 349 Mo. 73, 161 S.W.2d 968 (banc 1942); *Union Electric v. Coale,* 347 Mo. 175, 146 S.W.2d 631 (1940); *F. Burkhart Mfg. Co. v. Coale,* 345 Mo. 1131, 139 S.W.2d 502 (1940); and *Artophone Corp. v. Coale,* 345 Mo. 344, 133 S.W.2d 343 (1939), "no longer applicable in light of the adoption of the Multistate Tax Compact and § 32.210." *M.V. Marine, supra,* 606 S.W.2d at 648–49.

Missouri's vast trade area in many other states, for the same business, from the same customers. Company A has paid its charter fees we will say, to the State of New Jersey, and it is a citizen of that state. Company B has paid its charter and incorporating fees to the State of Missouri, and is a citizen of this state. Let us assume that each corporation did 90% of its business outside the State of Missouri. Corporation A then paid to the State of Missouri a tax upon only 10% of its net income, while Corporation B paid to its own government, of which it was a citizen, a tax upon 100% of its net income. It thus paid, assuming the business is equal, nine times as much tax to its own mother government as the stranger, equally protected by its laws. The discrimination is visible to the naked eye. It gave foreign corporations a tremendous competitive advantage."

*Id.* Mueller suggests and the majority determines that the *Artophone* tax policy interpretation should be retained.

The remedial intent accredited to the legislature should be that which is directly related to the nature of the discrimination. The above hypothetical case has been accepted as indicative of the discrimination which the legislature was thought to be alleviating. The discrimination was said to be in requiring domestic corporations to pay more income tax to Missouri than was required of foreign corporations when both did the same amount of business here. This was accepted as the explanation for the adoption of the "source of income" rule because that rule put all corporations upon equal footing; using the amount of income earned in Missouri to decide the amount of income taxable in this state.

This illustration is defective, however, because it fails to consider the tax consequences of the taxpayers' operation in other states. This contradicts the Court's view that: "In the field of income taxation in particular it is important to penetrate be-

yond legal fictions and academic jurisprudence to the economic realities of the cases." *In re Union Electric Company of Missouri,* 161 S.W.2d at 971. Interstate tax consequences are an economic reality and consideration of this demonstrates an alternative discrimination which equally could have been of legislative concern in the past and clearly is of present concern. *See* § 32.200, art. I, 2., 4., RSMo 1978; *see generally* W. Dexter, The Unitary Concept in State Income Taxation of Multistate-Multinational Businesses, 10 Urban Lawyer 181 (1978). If in the *Artophone* example, *supra,* the New Jersey Company had to pay to its home state on one hundred percent of its income then both companies would have an equal percent of income taxable. In this way any "discrimination" in Missouri against the Missouri company could be offset and evened in New Jersey relative to the New Jersey Company. This chart based upon the *Artophone* hypothetical demonstrates the point.

| | A Company of New Jersey | B Company of Missouri |
|---|---|---|
| Business in Missouri | 10% | 10% |
| Business in New Jersey | 10% | 10% |
| Business elsewhere | 80% | 80% |
| Income taxable in Missouri | 10% | 100% |
| Income taxable in New Jersey | 100% | 10% |
| Income taxable elsewhere | 80% | 80% |
| Total taxable income | 190% | 190% |

Consider in the alternative, other states including New Jersey tax only that portion of a company's income earned within that state regardless of whether it is a domestic or foreign company; that is, the other states used the source rule.[7]

| | A Company of New Jersey | B Company of Missouri |
|---|---|---|
| Business in Missouri | 10% | 10% |
| Business elsewhere | 90% | 90% |
| Income taxable in Missouri | 10% | 100% |
| Income taxable elsewhere | 90% | 90% |
| Total taxable income | 100% | 190% |

The result of Missouri's taxation on one hundred percent of the Missouri B Compa-

---

**7.** It is not unlikely that the "source" rule was used by many states to tax foreign companies in the first part of this century. For example, Connecticut used a "source" system beginning in 1915. *See Underwood Typewriter Co. v. Chaimberlain,* 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165 (1920), wherein Connecticut's taxation system is examined.

ny's income results in the double taxation of 90% of its income. All of this demonstrates that it is equally possible that the discrimination which the legislature sought to alleviate by use of the "source of income" rule was the double taxation of Missouri companies' "out-of-state" income; once in the state in which it is earned and twice by Missouri.

The use of "source" as the method of testing what income this state can tax its domestic corporation without fear of taxation by another state is effective because this same taxpayer is a foreign corporation in other states and may be taxed only upon income earned in that state. This is true because a state's jurisdiction to tax a foreign company's income depends upon the "nexus" requirements of the Fourteenth Amendment of the United States Constitution: "[A] 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise." (Citing earlier cases) *Mobil Oil Corporation v. Commissioner of Taxes,* 445 U.S. 425, 436–437, 100 S.Ct. 1223, 1231–1232, 63 L.Ed.2d 510 (1980); *see Northwestern States Portland Cement Co. v. Minn.,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959).

All of this demonstrates that this Court in *Artophone* may have misinterpreted the legislative intent underlying the "source of income" language. Notwithstanding this, the issue of present concern is the legislature's current intent in enacting the Compact and whether this may be harmonized with the purpose of the "source" rule, Chapter 145, RSMo 1978.

The four purposes of the Compact are expressed in § 32.200, art. I, RSMo 1978. One of them is the avoidance of "duplicative taxation." *Id.* The purposes of § 143.-451.1, RSMo 1978, and the Compact may only be reconciled if the policy of the former is as suggested herein. They are harmonious only if both are viewed as aimed at preventing the discriminatory effect of the double taxation.

If the view Mueller asserts is accepted, as does the majority, then the policies of the Compact and Chapter 143, RSMo 1978, become entirely different though both concern the same subject. The present case exemplifies the conflict between such distinct purposes. Mueller conceded that it paid no income tax to any other state during the years in question. Therefore the "subject to tax" requirement of the Compact appear unsatisfied while the very same income is accredited to an out-of-Missouri source. If Mueller is permitted to apportion such income, this state loses the opportunity to tax income which it would have if the "subject to tax" test were applied. Mueller and some *amicus* urge that the legislature has not expressed an intention to tax all income of Missouri corporations, citing *Artophone.* This is no longer correct since the adoption of the Compact. Article IV of the Compact is a rescript of the provisions of the Uniform Division of Income for Tax Purposes Act, 7A Uniform Laws Annotated 93, Master ed. 1978. The Uniform Act is based upon the principle of one hundred percent taxability.

The Act addressed the problem of how to divide the income of a multistate business for tax purposes among those states possessing power to tax some portion of that income. In place of the 'exceedingly diverse' methods developed by the states over the years, UDITPA proposed uniform principles of allocation and apportionment of a multistate firm's income designed to simplify the task of tax collection and reporting and to ensure that 100 percent of a multistate firm's income—neither more nor less—is taxable by the states.

\*     \*     \*     \*     \*     \*

It is important at the outset to understand that UDITPA does not attempt to ensure that 100 percent of a multistate firm's income is actually taxed by the states; it seeks only to ensure that 100 percent of such income is *taxable* by them.

W. Hellerstein, Construing the Uniform Division of Income for Tax Purposes Act:

Reflections on the Illinois Supreme Court's Reading of the "Throwback" Rule, 45 Univ. Chicago L.Rev. 768, 769–70 (1978); *see United States Steel Corp. v. Multistate Tax Commission,* 434 U.S. 452, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978). Therefore, to the extent that the Compact adopts a policy of full accountability and seeks to ensure one hundred percent taxability of a corporation's income, the "source of income" policy urged by Mueller, concededly accepted in earlier cases and now by the majority, works contrary to the policy of the Compact. Furthermore, the decision as to which of these policies would be implemented in any particular case would be left, not to the legislature, but to the taxpayer. Therefore, by Mueller's position and the majority's opinion, the decision as to which taxing policy will be advanced will be determined by which results in the least taxability of any particular taxpayer.[8] Such a result is clearly contrary to the Compact's full taxability policy and it is not reasonable to attribute it to the legislature.

The formerly accepted "discrimination policy" would also defeat a second purpose of the Compact expressed in article I to "facilitate taxpayer convenience and compliance in filing of tax returns and in other phases of tax administration." *Id.* The "subject to tax" test is easier to satisfy in the sense of proving one's entitlement to allocate or apportion. The earlier cases examined, *supra,* demonstrate the difficulty and inconsistency in administering the former "source" rule of entitlement.[9] As rec-

ognized in *M.V. Marine* the "subject to tax" test is superior to the "source" test because: "The advent of the Compact has simplified the process of determining entitlement to apportion taxes by changing the focus of the inquiry from a search for the 'source' of income to a simple showing of jurisdictional 'tax liability' in another state." *Id.* 606 S.W.2d at 649.

In response to the majority's concept of legislative approval of Mueller's position by its failure to adopt alternative legislation, the answer is twofold. First, as noted in 3 Sutherland Statutory Construction, *supra,* § 49.10, p. 291, "legislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon' to follow in construing a statute." *Id.* Second, although legislative intent may be gleaned from failure of proposed legislation, the noted Senate and House Bills which have not been enacted are aimed at completely eliminating or substantially modifying the single factor apportionment formula. *See, e.g.,* Senate Bills 471 and 481, 79th General Assembly, First Regular Session; House Bill 507, 80th General Assembly, First Regular Session. This is not the effect of the Compact or of the *M.V. Marine* decision. A taxpayer may use that formula if he has shown that he is entitled to do so by establishing his jurisdictional tax liability elsewhere § 32.200, art. IV, 2., 3., RSMo 1978. Therefore, these legislative proposals have been aimed at the elimination of a formula which *M.V. Marine* recognized certain tax-

---

**8.** Of course taxpayers are permitted to choose various ways of reducing tax liability; selecting depreciation methods is an obvious example. However, that choice is analogous to the election of allocation versus apportionment. That is distinct from the issue here. Using the depreciation example the analogous situation would be permitting taxpayers to decide for *themselves whether they are entitled to a* depreciation allowance regardless of whether any occurred or whether taxpayer had any ownership interest in the depreciated property.

**9.** The difficulty of "source" determinations remains to the extent that one who has shown entitlement to apportion is faced with the confusion created by the ambiguity of the "transaction" phraseology in § 143.451.2 RSMo 1978. To some extent this may be alleviated by the

definitions supplied in § 144.010(7) RSMo Supp.1982, which will aid in deciding when "a transaction involving the sale of tangible property is: 'wholly in this state' [or] 'partly within this state and partly without this state.' " as used in § 143.451.2, RSMo 1978. It is argued that § 144.010(7), RSMo Supp.1982, demonstrates the legislature's intent to reaffirm the pre *M.V. Marine* construction of § 143.451, RSMo 1978. Section 144.010(7), RSMo Supp. 1982 serves only to define the "transaction-sales" terms used in § 143.451.2, RSMo 1978, (perhaps in response to the confusion in the past). It does not affect the issue of entitlement to allocate or apportion as defined in § 143.451.1, RSMo 1978, and therefore is inapposite.

payer's are entitled to use at their election. For this reason they are inapposite, and the construction concept is not persuasive.

### V

Finally, it is asserted that of the other compact states, four [10] permit "taxpayers to determine entitlement to allocate and apportion income using tests other than the 'jurisdictional tax' liability test in article IV of the Multistate Compact" and "In no state or the District of Columbia has there been a decision involving the issue of entitlement as determined by the Court in *M.V. Marine;* nor has the issue apparently ever been raised." It is asserted that no other jurisdictions' "statutes, cases, regulations or instructions to the income tax returns direct an interpretation similar to the one suggested in *M.V. Marine.*" From this *amicus* asserts that Mueller's position is correct. This argument falls of its own weight. The lack of activity in other states does not establish the error in one action versus another in Missouri. Additionally, even if prohibitive, the statutes cited by *amicus* are substantially different and as such are not analogous.

The argument that the "Suggested State Legislative and Enabling Act," circulated by the Multistate Tax Commission, indicates the drafters of the Compact intended the opposite of that found in *M.V. Marine* also fails. The Interstate Tax Commission has filed a memorandum stating its position in this litigation and clearly supports affirmance of *M.V. Marine.*

All briefs and arguments considered in their entirety, the decision, originally made in *M.V. Marine* that the analysis used in earlier cases is no longer applicable and that the right to allocate and apportion is determined by use of the Compact, should be reaffirmed.

Because the decision in *M.V. Marine* is an appropriate interpretation of legislation, neither it, nor this dissent which follows and applies it, is subject to the majority's charge of dictum and judicial legislation in imposition of taxes.

### VI

The question would remain whether Mueller is subject to the tax in another state. The Tax Commission made its findings of fact prior to the *M.V. Marine* decision. The record reflects that the Commission's attention was focused on whether any part of Mueller's income was derived from "transactions . . . partly outside the state," § 143.451.2(2)(b), RSMo 1978. In *M.V. Marine,* the cause was remanded to provide the taxpayers "an opportunity to show their *entitlement,* if any, to allocate their income pursuant to the requirement of § 32.200." *M.V. Marine,* 606 S.W.2d at 653.

The activities of Mueller's salespersons and repair-service personnel are the only contacts which the company has with its out-of-state customers. The facts show and both the commission and the Court found that the salespersons are authorized only to solicit sales; all other aspects of the sales are performed only in Missouri. Mueller argues that frequently negotiations occur after the original solicitation and this is more than "mere solicitation" of orders. Such negotiations, however, do not rise to the level of Mueller's presence in other states. It is difficult to imagine a solicitation without some discussion of terms. As a matter of course, some discussion is always included in solicitation, and the results of these negotiations are meaningless until approved by the Missouri office. In 1959, Congress passed Public Law 86–272, 73 Stat. 555, 15 U.S.C. § 381. It provides:

(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

(1) the solicitation of orders by such person, or his representative, in such

---

**10.** *Amicus* cites Colo.Rev.Stat. § 39–22–310 *et seq.;* D.C.Code Ann. § 47–1810.1 *et seq.* and Reg. § 309.5; Hawaii Rev.Stat. § 235–5; Montana Code Ann. § 15–31–301 *et seq.*

State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

As a matter of federal law other states are prohibited from taxing mere solicitation by one in interstate commerce. *See generally* 1959 U.S.Code Cong. and Ad.News, p. 2549; *United States Steel Corp. v. Multistate Tax Commission,* 434 U.S. 452, 455–56, 98 S.Ct. 799, 803–04, 54 L.Ed.2d 682 (1978); *U.S. Tobacco Co. v. Comm'n,* 478 Pa. 125, 386 A.2d 471, *cert. denied,* 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). This provision was discussed by this Court in *State ex rel. Ciba Pharmaceutical Products, Inc. v. State Tax Commission,* 382 S.W.2d 645 (Mo. banc 1964), where the Court set aside certain income tax assessments against the taxpayer, a foreign corporation, because its contacts in this state were insufficient to constitute the requisite business activity necessary for imposition of state income tax. The activities of Mueller in other states are similar but certainly are not greater than the activities of the Ciba corporation in the State of Missouri. Thus it appears Mueller is not entitled to apportion its income from out-of-state customer solicitations because they are not subject to any tax elsewhere.

Mueller's fact stipulation classifies all income involved as derived from "sales to out-of-state purchasers." Although not conclusive,[11] Mueller admits no income taxes paid to any other state during the years involved. It has never suggested it is subject to tax in another state. Upon such record assessment of tax on 100 percent of Mueller's income is proper because Mueller

is not subject to any tax in another state and thus it should not be permitted to apportion as though it was.

The judgment should be affirmed.

---

11. Article IV, § 3(a) of the Compact provides the right to allocate and apportion if another state "has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not."